**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *IN RE ODDITY SECURITIES LITIGATION* | Case No. 1:26-cv-02046-PAE<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## TABLE OF CONTENTS


Page(s)

NATURE OF THE ACTION ........................................ 1

PRELIMINARY STATEMENT ........................................ 2

JURISDICTION AND VENUE ........................................ 6

PARTIES ........................................ 7

SUBSTANTIVE ALLEGATIONS ........................................ 8

I. BACKGROUND ........................................ 8

II. ODDITY RELIES HEAVILY ON SOCIAL MEDIA ADVERTISING TO SUPPORT ITS SALES GROWTH ........................................ 9

III. ODDITY TOLD INVESTORS THAT IT FOCUSED ON ITS ONLINE MARKETING COSTS AND HAD EXPERTISE IN ANALYZING SUCH DATA AND ALGORITHMS........................................ 10

IV. ODDITY RECEIVED TIMELY NOTIFICATIONS OF CHANGES IN ITS CUSTOMER ACQUISITION COSTS AS A RESULT OF CHANGES IN META'S ALGORITHM DUE TO THE DOWNGRADE OF THE AD QUALITY SCORE FOR ODDITY........................................11

A. Mechanics of the Meta Advertising Auction System ........................................ 12

B. Key Factors Influencing Ad Costs ........................................ 13

C. Ad Quality, Product Return Rates, and the Oddity Tech Case Analysis .. 13

D. Operational Monitoring Mechanisms for Cost Per Result (CPR) ............ 14

E. Meta Performance Notifications and System Triggers ........................................ 15

F. Presentation and Visualization of CPR Results ........................................ 16

G. Customization of Update Frequency and Notification Controls............... 16

H. Dr. Knoblock's Conclusions ........................................ 17

V. DEFENDANTS BECOME AWARE OF THE ALGORITHM CHANGE, INCREASE IN ACQUISITION COSTS AND DECLINE IN SALES ............... 17

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS........................................ 21

VI. DEFENDANTS' OMISSIONS OF MATERIAL FACTS .................................. 21

A. DEFENDANTS VIOLATED THEIR AFFIRMATIVE DISCLOSURE DUTIES UNDER ITEM 105/FORM 20-F ITEM 3(D) AND ITEM 303/FORM 20-F ITEM 5 .......................................................... 22

B. THE ANNUAL REPORT'S GENERIC RISK WARNINGS WERE MATERIALLY INCOMPLETE HALF-TRUTHS ................................. 25

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ............................................................................... 26

THE TRUTH BEGINS TO EMERGE ......................................................................... 31

ADDITIIONAL SCIENTER ALLEGATIONS ........................................................... 35

PLAINTIFFS' CLASS ACTION ALLEGATIONS .................................................... 36

COUNT I ..................................................................................................................... 39

(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ................................................................. 39

COUNT II .................................................................................................................... 42

(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)... 42

PRAYER FOR RELIEF .............................................................................................. 43

DEMAND FOR TRIAL BY JURY ............................................................................. 43

## NATURE OF THE ACTION

1. This is a securities fraud class action brought by Lead Plaintiffs Clal Pension and Provident Ltd., Clal Insurance Company Ltd., and Atudot Pension Fund for Employees & Independent Workers Ltd. (collectively, "Clal''), The Phoenix Insurance Company Ltd. and The Phoenix Provident Pension Fund Ltd. (collectively, "Phoenix") and additional Plaintiff Travis Peters (collectively with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned counsel. The action charges that the defendants named herein violated 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2. The Action is brought on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Oddity Tech Ltd. ("Oddity" or the "Company") securities between February 26, 2025 and June 1, 2026, both dates inclusive (the "Class Period"). The Action is brought against Defendants Oddity, co-founder and Chief Executive Officer ("CEO") Oran Holtzman ("Holtzman"), co-founder and Chief Product Officer, Shiran Holtzman-Erel ("Holtzman-Erel") and Global Chief Financial Officer ("CFO") Lindsay Drucker Mann ("Mann").

3. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, SEC filings, wire and press releases published by and regarding Oddity, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

4. Oddity is a consumer technology company that builds digital-first brands for the beauty and wellness industries in the U.S. and internationally. The Company serves consumers through its artificial intelligence-driven online platform, using data science, machine learning, and computer vision capabilities to identify consumer needs and develop solutions in the form of beauty, wellness, and technology products.

5. A significant part of Oddity's value proposition is its "Try Before You Buy" ("TBYB") e-commerce model across its online beauty and wellness platforms – such as IL Makiage and SpoiledChild. TBYB allows consumers to test products at home before they commit to the full purchase. Under this structure, customers provide a payment method for pre-authorization, receive products to evaluate at home, and are supposed to be fully charged only after a trial period if they choose to keep them.

6. According to former Oddity employee ("FE-1") – who regularly interacted with Defendants Holtzman, Holtzman-Erel and Mann, Oddity received "a lot" of complaints from customers because they were either charged when they were not supposed to be and/or were unable to cancel their subscription. FE-1 stated that the complaints were so prevalent that "Il Makiage had a reputation for people thinking it was a scam." Oddity's website customer interface was also problematic. "If you entered the website through a Facebook ad or Instagram ad, you were running into a lot of bugs, which is why people thought it was a scam." As FE-1 explained, Oddity's "customer service team [was] trying to minimize how much of all of the complaints coming in went public, trying to minimize how many people were commenting on Instagram."

7. As an exclusively online company, Oddity relies heavily on advertising through social media to support its sales growth. The Company's customer acquisition costs and revenue are directly impacted by social media algorithms, which utilize user behavior, demographic and

consumer satisfaction data to facilitate the Company's exposure to online advertising spaces via auctions ("ad auctions") and, accordingly, online consumer traffic.

8. The quality of a company's ad auction based on an advertising partner's algorithm generally correlates favorably with a company's customer acquisition costs. A high-quality ad auction will generally result in potential customers seeing more relevant, engaging and prominently placed ads, resulting in lower costs per click ("CPC") and higher click-through ("CT") rates. Conversely, placement in lower-quality ad auctions through the algorithm will yield less relevant and poorly placed ads, leading to higher CPC and lower CT rates. Higher-quality ad auctions tend to result in lower customer acquisition costs as well as higher sales and revenue, whereas lower-quality ad auctions tend to result in higher customer acquisition costs as well as lower sales and revenue.

9. During the Class Period (and unbeknownst to investors), Oddity did not diversify its social media advertising. Rather, the Company advertised solely through Meta's Instagram and Facebook. Given that Oddity sold its products exclusively online – having no physical stores and no other distribution channels – the Company's reliance on Meta for advertising made the Company vulnerable to any change in Meta's algorithm, which could suddenly demote Oddity's advertisements to less desirable locations and demographics outside of the Company's control. Defendants never disclosed the Company's reliance on a single advertiser, which made an investment in Oddity speculative and high risk. This violated Defendants affirmative disclosure obligations under Item 105/Form 20-F Item 3(D) and Item 303/Form 20-F Item 5 to disclose "risk factors" for an investment in the Company as well as "uncertainties" that could have a material impact on the Company's financial results. Indeed, among the non-exhaustive list of "risk factors"

needing to be disclosed provided under Item 3(D) is "dependence on a limited number of customers or suppliers."

10. The undisclosed risks materialized in June 2025 following a change in Meta's algorithm for advertisements. Because Oddity's high number of customer complaints, the Company's advertisements were demoted to less desirable locations and demographics. According FE-1, it was June 2025 when the algorithm change and its impact were noticed and brought to Oddity's C-suite attention. Specifically, FE-1 stated that the Company started seeing that "something was not right with the numbers, something wasn't making sense" and "[t]hey were seeing a big decrease in purchases." By October 2025, the algorithm change was having such a significant impact that Defendants instigated a "fire drill," pulling dozens of employees from other projects and products to diagnose the issues with the algorithm change and its impact. FE-1 and others were explicitly told not to speak about the issue to anyone.

11. Throughout the Class Period, Defendants failed to disclose the detrimental change in the algorithm as well as the resulting increase in customer acquisition costs and declining new customer purchases. Instead, Defendants misled investors about the direction of the Company. For example, on August 4, 2025, the Company announced its Q2 results and Holtman stated, "[o]ur business is growing with high profitability, multiple engines, and long runways[.]" Mann stated, "The third quarter is also off to a strong start[.] . . . The remainder of our year is driven mostly by a high visibility backlog of repeat orders." In touting that the "business is growing" with "long runways" and "high visibility backlog of repeat orders", Defendants misled investors by failing to disclose that they knew that new customer acquisition costs and purchases indicated that any growth or "runway" would be extremely short before it dropped precipitously.

12. During the Company's Q3 2025 earning call on November 20, 2025 – in the midst of the Company's "fire drill" surrounding the algorithm changed – Mann acknowledge that the Company had "higher-than-planned media costs in the quarter" but falsely asserted that they "have seen the media backdrop improve as we progressed into the fourth quarter." And when specifically asked about the Company's projections for 2026 and "marketing efficiency" Mann stated, "[***T]here's no change to our algorithm of 20% revenue growth and 20% adjusted EBITDA margin****i*," "***business continues to be on a very healthy footing***," and he repeated that "***we did have some higher acquisition costs…[but] the environment has actually improved for us as we've gotten into the fourth quarter.***" While Mann attributed the higher expenses to "increased spending initiatives" for its new products he made no mention of the impact from the algorithm change from Oddity's largest advertising partner and falsely asserted ***So it's been very manageable for us, and we're feeling really good as we head into Q4***."

13. The truth began to emerge on February 25, 2026, when Oddity issued a press release "announc[ing] its financial results for the fourth quarter and full year ended December 31, 2025." In the press release, Holtzman, said that "we experienced a dislocation in our account with our largest advertising partner that we believe was driven by algorithm changes which diverted us to lower quality auctions at abnormally high costs", which "result[ed] in significant increases in new user acquisition costs that are not correlated with the market or our historical experience."

14. In the same press release, Mann stated:

> Given the dislocation we are experiencing in acquisition costs, ***we expect first quarter 2026 revenue to decline approximately 30% year-over-year***, but we hope to see material improvement in the second half of 2026. We plan to issue our financial outlook for FY 2026 in the next few months when we have more visibility.[1]

---

[1] Unless otherwise noted, all emphases herein are added.

15. On this news, Oddity's Class A ordinary share price fell $14.28 per share, or 49.21%, to close at $14.74 per share on February 25, 2026, and continued to decline, closing at $13.77 on February 26, 2026.

16. On June 2, 2026, Oddity issued a press release "announc[ing] its financial results for the first quarter ended March 31, 2026" in which the Company stated: "For the second quarter of 2026, ODDITY expects net revenue to decline between 25 and 30% year-over-year." During the earnings call that followed, in response to an analyst's question, Mann disclosed not only that the customer acquisition costs continued to increase in Q2 2026 but that the "rate of increase did get worse" as well."

17. On this news, Oddity's Class A ordinary share price fell $4.14 per share, or 29.61%, to close at $9.84 per share on June 2, 2026.

18. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Oddity's Class A ordinary shares trade in the U.S. on the Nasdaq Global Market ("NASDAQ"), which is located in this District.

22. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23. Plaintiffs, as set forth in the previously filed certifications (ECF Nos. 1-2, 15-3), acquired Oddity securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

24. Defendant Oddity is organized under the laws of Israel with principal executive offices located at 8 HaHarash Street, Tel Aviv-Jaffa, 6761304, Israel. The Company's Class A ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "ODD".

25. Defendant Holtzman has served as Oddity's CEO at all relevant times. Holtzman is also one of the Company's co-founders.

26. Defendant Holtzman-Erel has served as Oddity's Chief Product Officer at all relevant times. Holtzman-Erel is also one of the Company's co-founders.

27. Defendant Mann has served as Oddity's Global CFO at all relevant times.

28. Defendants Holtzman, Holtzman-Erel and Mann are collectively referred to herein as the "Individual Defendants".

29. The Individual Defendants possessed the power and authority to control the contents of Oddity's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Oddity's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Oddity, and their access to material information available to them but not to the public, the Individual

Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

30. Oddity and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. BACKGROUND

31. Oddity is a consumer technology company that builds digital-first brands for the beauty and wellness industries in the U.S. and internationally. The Company serves consumers through its AI-driven online platform, using data science, machine learning, and computer vision capabilities to identify consumer needs and develop solutions in the form of beauty, wellness, and technology products.

32. Oddity's core brands and products are Il Makiage, SpoiledChild, Methodiq and Oddtype. ***Il Makiage***: A flagship digital beauty brand marketed for its data-backed online shade-matching quizzes, offering foundation, concealers, and face makeup. ***SpoiledChild***: A targeted hair and skin-care line featuring items like anti-aging serums and customized wellness formulas directed by machine learning. ***Methodiq***: A medical skincare and telehealth platform delivering prescription and over-the-counter kits targeting conditions like acne, eczema, and hyperpigmentation. ***Oddtype***: A specialized sub-brand offering modern color cosmetics, including glossy and blur lip tints like the *Unseen Balloon Tint* and *Unseen Mirror Tint*.

33. Q1 and Q2 are historically Oddity's largest periods of user acquisition, and from that acquisition, the Company typically generates significant repeat revenue over the balance of the year.

## II. ODDITY RELIES HEAVILY ON SOCIAL MEDIA ADVERTISING TO SUPPORT ITS SALES GROWTH

34. Unlike most other beauty and wellness companies, Oddity is 100% e-commerce direct to customer without any brick-and-mortar locations or other distribution channels. The Company has distinguished itself from traditional companies: "Legacy players continue to perform well by leveraging offline channels as the main gateway to the consumer."

35. The Company's reliance on e-commerce and social media was identified as part of its value proposition: "The potential reach of a successful online model is significant — unconstrained by physical store footprints or local marketing limitations. Our technology-powered model has the ability to reach a broad and diverse audience in beauty and wellness."

36. E-commerce companies such as Oddity rely heavily on advertising partners to support their sales growth. As such, the Company's revenue and customer acquisition costs are directly impacted by its advertising partners' algorithms, which utilize user behavior, demographic, customer satisfaction and interest-related data to facilitate the Company's exposure to online advertising spaces via ad auctions and, accordingly, online consumer traffic.

37. The quality of a company's ad auctions generally correlates favorably with customer acquisition costs. A high-quality ad auction will generally result in potential customers seeing more relevant, engaging and prominently placed ads, resulting in lower CPC and higher CT rates. Conversely, lower-quality ad auctions will yield less relevant and poorly placed ads, leading to higher CPC and lower CT rates. As such, higher-quality ad auctions tend to result in lower customer acquisition costs, whereas lower-quality ad auctions tend to increase customer acquisition costs.

## III. ODDITY TOLD INVESTORS THAT IT FOCUSED ON ITS ONLINE MARKETING COSTS AND HAD EXPERTISE IN ANALYZING SUCH DATA AND ALGORITHMS

38. Oddity distinguishes itself from other beauty and wellness companies, describing itself as "a consumer ***tech platform*** that is built to transform the global beauty and wellness market." The Company's SEC filings have stated:

- "We are a technology company seeking to reinvent every aspect of a massive industry. Our tech team is the largest team within our company today and comprises over 40% of our headcount as of December 31, 2023. We invest heavily in data science, machine learning, and computer vision…"
- "We deploy algorithms and machine learning models leveraging user data seeking to deliver a precise product match and seamless shopping experience."
- "We are a data-driven company and one of our significant differentiators is the vast amount of quality, actionable data that we are able to learn about our users."
- "Across ODDITY, technology and data drive all business functions from product development to marketing and operations to enabling our powerful digital model."
- "Our sales and marketing capabilities represent a core and differentiated competency that is essential to the success of the ODDITY platform."
- "We have invested heavily in building a talented in-house marketing team, while also developing proprietary technologies that enable us to build data-driven and highly personalized campaigns that can scale globally on digital platforms. Unlike the majority of consumer brands, our in-house marketing team manages our performance marketing from end-to-end, without the use of outside agencies."
- "We continue to partner with various social media platforms to ensure we gain exposure with broader audiences."

39. Defendants have recently acknowledged their awareness that algorithm changes by Oddity's ad partners can materially impact the marketing, advertising and sale of its products and that they have had to address such issues prior to 2025, stating that "Over the past eight years" the Company had to address "multiple changes on ad tech side," including "[a] prominent one was iOS 14" in 2022 prior to the Company going public and that "[w]e have navigated algorithm adjustments by our ad partners in the past."

## IV. ODDITY RECEIVED TIMELY NOTIFICATIONS OF CHANGES IN ITS CUSTOMER ACQUISITION COSTS AS A RESULT OF CHANGES IN META'S ALGORITHM DUE TO THE DOWNGRADE OF THE AD QUALITY SCORE FOR ODDITY

40. As explained by Dr. Craig Knoblock, Oddity would have received from Meta timely notifications of changes in its customer acquisition costs through Meta's real-time push notifications or the daily and/or weekly email reports.

41. Dr. Knoblock is a Research Professor of Computer Science at the University of Southern California (USC), where he has served as a faculty member for over 35 years. Throughout his 35 years of experience in computer science research, academic instruction, and software architecture, he has specialized in artificial intelligence, information integration, data analytics, machine learning, and semantic web technologies. His academic work has focused heavily on complex algorithms for managing data.

42. In addition to his academic tenure at USC, Dr. Knoblock possesses extensive experience in founding, operating, and managing commercial technology businesses. Specifically, he co-founded and successfully built two technology startup companies: Fetch Technologies and Geosemble Technologies. Both ventures developed commercial software products leveraging advanced data extraction, geospatial intelligence, and automated analytics. He served in key executive leadership roles in both entities through their complete corporate lifecycles up to their successful acquisition and sale. As a result of both his 35 years of computer science research/teaching at USC and his hands-on operational leadership in co-founding and selling Fetch Technologies and Geosemble Technologies, he possesses comprehensive technical and practical business expertise regarding internet-scale software platforms, commercial infrastructure, and digital marketing and advertising.

### A. Mechanics of the Meta Advertising Auction System

43. Advertising on Instagram and Facebook operates within Meta's unified programmatic advertising infrastructure, which utilizes an automated real-time auction system. Rather than purchasing advertising space through traditional fixed-rate pricing or manual negotiations, advertisers participate in a continuous, dynamic auction where ad placements are allocated algorithmically every time an eligible user scrolls through their Facebook or Instagram Feeds.

44. To participate in the Facebook or Instagram auction, advertisers establish initial parameters within Meta Ads Manager. Specifically, advertisers set a defined budget and establish a target audience based on demographics, interests, behaviors, and custom parameters. To maintain strict financial management, advertisers can set spending limits at three distinct operational levels:

- **Daily Spending Limits:** Specifies the maximum monetary amount the advertiser is willing to spend on a campaign each day.
- **Lifetime Spending Limits:** Establishes the total ceiling amount for the entire duration of a specific campaign run.
- **Campaign Spending Limits:** Defines an overarching monetary cap across multiple ad sets contained within a broader campaign structure.

45. Once these parameters are defined, Meta's automated bidding algorithm executes bids on behalf of the advertiser in real-time auctions. The system offers flexible delivery pacing options: it can bid evenly throughout the campaign schedule to maintain consistent delivery, or it can adjust bidding aggressiveness based on explicit manual bid controls and constraints established by the advertiser. Across both delivery modes, the primary objective of Meta's automated bidding algorithm is to maximize efficiency by optimizing the Cost Per Result (CPR)—delivering the maximum number of desired user outcomes (such as link clicks, lead form submissions, or product purchases) for the specified budget.

**B. Key Factors Influencing Ad Costs**

46. In Meta's ad auction, the winning ad is not determined solely by the highest monetary bid. Instead, Meta evaluates each candidate ad using a Total Value formula, which balances advertiser value with user experience. Consequently, the actual cost incurred by an advertiser to win an auction is heavily influenced by three core factors:

- **Targeting:** Refers to the size and type of audience you want to reach. Targeting highly competitive, niche, or high-demand demographic segments increases competition in the auction, thereby driving up base bidding costs. Conversely, broader target audiences generally yield lower base CPRs.

- **Ad Quality:** Measures how relevant and engaging your ad is to the people seeing it. Meta calculates Ad Quality using historical feedback signals, including ad clicks, video watches, positive interactions (likes, shares), and negative feedback signals (hiding ads, reporting ads, negative comments and product returns). Higher ad quality earns an auction discount, lowering costs.

- **Estimated Action Rates:** Represents the mathematical probability that a specific user will perform the target action you are optimizing for (e.g., clicking a link, installing an app, or completing a transaction). Meta's machine learning models estimate this likelihood based on historical user behavior, ad category performance, and contextual signals.

**C. Ad Quality, Product Return Rates, and the Oddity Tech Case Analysis**

47. An essential, highly sensitive component of Meta's Ad Quality scoring framework is post-click and post-purchase consumer experience data. The post-conversion indicators include negative comments or complaints, as well as the return rate, which is the proportion of customers who return a product after purchasing. These indicators serve as a primary signal of customer dissatisfaction, misrepresentation, or poor product-market fit.

48. A critical issue arose for Oddity in that the Company had a large number of customer complaints and a high return rate, which resulted in a lower ad quality score. Under Meta's Total Value auction formula, lower Ad Quality directly reduces an advertiser's auction competitiveness, forcing the system to charge substantially higher prices to place their ads. This

algorithmically raised the cost of Oddity's ads, elevating their Cost Per Result (CPR) and decreasing their overall marketing efficiency.

49. Oddity maintains that this increased cost was due to the structural interaction between their commercial business model and Meta's algorithmic quality scoring. Oddity implemented a prominent 'Try Before You Buy' promotional policy, which explicitly allowed consumers to order products, test them at home, and return them without incurring any cost or risk. While this strategy successfully reduced friction and drove high initial conversion rates, it naturally generated a significantly higher volume of product returns compared to traditional direct-to-consumer retail models.

50. Oddity claims that the fundamental problem was that Meta's automated ad evaluation infrastructure interpreted this elevated product return volume purely as negative consumer feedback. Meta's algorithms failed to distinguish between returns resulting from product dissatisfaction versus routine returns incentivized by Oddity's deliberate 'Try Before You Buy' offer. As a result, Meta's system classified Oddity's advertisements as having an unusually high return rate, which led to a severe downgrade in Oddity's Ad Quality score.

51. Regardless of whether the severe downgrade in Oddity's Ad Quality score was due to the 'Try Before You Buy' promotional policy or due to customer complaints and dissatisfaction with the product or service, the fact is that the severe downgrade in Oddity's Ad Quality score significantly increased the Cost Per Result and that, in turn, resulted in poor financial performance for Oddity Tech.

**D. Operational Monitoring Mechanisms for Cost Per Result (CPR)**

52. Because the Cost Per Result ("CPR") is a critical operational metric that directly dictates unit economics, profitability, and return on ad spend ("ROAS") for any business, Meta

Ads Manager provide advertisers with multiple native channels to closely monitor CPR performance in real time:

- **Push Notifications (Real-Time Alerts):** Advertisers can enable mobile push notifications via the Meta Ads Manager mobile application. This enables real-time, instantaneous push alerts whenever significant performance fluctuations or anomalies occur.

- **Email Notifications:** Advertisers can configure scheduled or threshold-triggered email notifications on ad performance, delivering periodic operational updates and performance summaries directly to campaign managers.

- **Automated Rules & Threshold Alerts:** Advertisers can program customized automated rules within Meta Ads Manager. For example, an advertiser can establish an automated rule instructing the platform to send an immediate notification or automatically pause delivery if the CPR exceeds a specific pre-defined dollar threshold (e.g., alert if CPR exceeds $25.00).

### E. Meta Performance Notifications and System Triggers

53. Meta's notification infrastructure is designed to proactively inform advertisers when significant delivery changes, efficiency shifts, or operational milestones occur during an ad campaign. Updates are automatically triggered by critical system events, such as a sudden shift in the CPR or delivery velocity. The standard performance notification triggers include:

- **Significant Performance Shifts:** Triggered if your ad campaign's results or costs change significantly compared to your recent historical baseline average (e.g., a sudden 30% spike in CPR or a sharp decline in conversion rate).

- **Performance Milestones:** Triggered when your ad campaign achieves key quantitative thresholds, such as reaching a specific aggregate number of results (e.g., generating your 100th lead or 1,000th sale).

- **Budget Milestones:** Triggered when campaign spend crosses predefined financial thresholds (e.g., when you have spent 50%, 75%, or 90% of your total allocated lifetime budget).

- **End of Campaign:** Triggered upon the expiration of a campaign's scheduled run time, providing a comprehensive final summary of overall ad performance, total expenditure, and cumulative CPR.

### F. Presentation and Visualization of CPR Results

54. Within Meta Ads Manager and reporting dashboards, Cost Per Result (CPR) metrics are presented to advertisers through two primary analytical formats:

- **Numeric Value (Average Cost Metric):** Represents the exact mathematical average cost incurred for each desired outcome achieved during a selected date range. The formula is calculated as total ad spend divided by total results achieved:
    - Formula: CPR = Total Ad Spend / Total Number of Results
    - Numerical Example: If an advertiser spends $100.00 on a campaign during a specified date range and acquires 10 leads, the resulting CPR is exactly $10.00 per lead ($100.00 / 10 = $10.00).
- **Performance Graph (Chronological Line Chart):** A visual line chart that plots daily CPR fluctuations chronologically over time. This graphical representation enables advertisers to visually track efficiency trends, identify performance spikes or drops, analyze the impact of external market changes, and detect creative ad fatigue across successive days of ad delivery.

### G. Customization of Update Frequency and Notification Controls

55. To prevent notification fatigue while ensuring timely operational oversight, Meta allows customers and advertisers to customize the delivery frequency of performance updates. Advertisers can tailor their notification parameters through two main capabilities:

- **Real-Time Alerts:** Enabled via mobile push notifications to receive instant, immediate alerts the moment significant CPR shifts or system milestones occur.
- **Scheduled Periodic Updates:** Advertisers can schedule structured daily or weekly summary reports detailing CPR trends, total spend, and campaign performance metrics, delivered via email or dashboard digests.

56. By configuring these real-time alerts and scheduled reporting intervals, advertisers maintain granular control over how and when performance telemetries are communicated, ensuring rapid responses to adverse cost movements while maintaining strategic high-level oversight.

### H. Dr. Knoblock's Conclusions

57. Based upon Dr. Knoblock's technical review of Meta's advertising documentation and Oddity's corporate disclosures, he summarizes his expert opinions as follows:

- "Meta's advertising platform relies on an automated real-time auction engine driven by a Total Value algorithm that balances advertiser bids, estimated action rates, and ad quality scores to optimize Cost Per Result (CPR)."

- "Ad Quality is a fundamental pricing determinant. Meta's quality algorithms incorporate post-purchase user signals—specifically product return rates—as primary indicators of consumer satisfaction."

- "Due either to Oddity Tech's 'Try Before You Buy' business model, which incentivized zero-cost product returns, or customer dissatisfaction with the product or service, Meta's automated algorithms significantly lowered Oddity's Ad Quality score and systematically driving up their CPR."

- "Meta provides robust monitoring tools—including push notifications, email reports, automated rules, numeric metrics, and daily trend line charts—allowing advertisers to track CPR in real time or via customized daily/weekly schedules."

- "Based on the monitoring tools, Oddity Tech would have received timely notification of the changes in the CPR. If they had configured push notifications, then would have received real-time notification of the significant increase in CPR. But even if they had not configured push notifications, they would have received email reports that would have made them aware of the significant changes to CPR immediately or at longest within a week."

## V. DEFENDANTS BECOME AWARE OF THE ALGORITHM CHANGE, INCREASE IN ACQUISITION COSTS AND DECLINE IN SALES

58. A former employee ("FE-1") described how Oddity became aware of Meta's algorithm change and its significant impact on its media and customer acquisition costs as well as purchases and revenue.[2]

59. FE-1 worked for Oddity from mid-2024 to mid-2026 as a Product Development Coordinator.

[2] To protect their anonymity, FE's are all described using male pronouns regardless of the individual's gender.

60. FE-1 explained how the Company was structured: "The structure of Oddity is a house of brands," he said, including the original brand, Il Makiage, which was followed by SpoiledChild, then Methodic, and finally Brand 4, which had yet to be given a name." "Il Makiage made the bulk of revenue," he said. "It was the reason why they were able to develop Methodic and Brand 4." FE-1 said the SpoiledChild brand essentially supported itself. FE-1 worked on Oddity's product in development, "Brand 4," which had yet to be given a commercial name. FE-1 was tasked with helping to bring Brand 4 to market.

61. FE-1 was unequivocal about his knowledge of the issues surrounding Oddity's primary product brand, Il Makiage, despite being assigned to work on development of a different brand. "I was very much aware of what was going on," he said. "Our group was called in to try to fix the problem."

62. FE-1 stated that widespread issues with the Il Makiage website were present and prevalent at least since FE-1 joined Oddity and customers were complaining: "The whole business model for Il Makiage is subscriptions. It's called Try Before You Buy. What happens, you get a hold put on your credit card, pending authorization. You return product or you don't, and then you get charged. A lot of people filing complaints were saying they had gotten charged or they couldn't cancel their subscription." Oddity's website customer interface was also problematic. "If you entered the website through a Facebook ad or Instagram ad, you were running into a lot of bugs, which is why people thought it was a scam," FE-1 said. FE-1 explained, "There were complaints. We had a pretty robust customer service team trying to minimize how much of all of the complaints coming in went public, trying to minimize how many people were commenting on Instagram." "[T]hat was something I had known about right after I joined," FE-1 said. "Il Makiage had a reputation for people thinking it was a scam," FE-1 continued. "It wasn't necessarily a scam; you

would get product. But there were definitely things that were shady about how people were billed." When asked if that was how Oddity made money, FE-1 stated, "Yeah."

63. When asked about ad auctions, the change in the algorithm and low versus high and the impact on Oddity's costs, FE-1 stated, "anyone can put an ad on Meta. You have to register a business account, then anyone can run an ad," he said. "The algorithm has a role in obviously what is shown to who. I think there are different high-value, low-value." FE-1 stated that because Meta does not want to lose money "If they think it's a scam, they won't show it to people who think it's a scam."

64. FE-1 stated that it was June 2025 when the first algorithm change issues were noticed and brought to Oddity's C-suite attention. Specifically, FE-1 stated that in 2025, the Company started seeing that "something was not right with the numbers, something wasn't making sense" and "[t]hey were seeing a big decrease in purchases" and "it was first brought up to leadership in maybe June of last year." At that time, "nothing happened," FE-1 said. Then by October "they saw it was having a large impact."

65. As to the initial discovery in June 2025, FE-1 said, "People on the digital team or consumer team probably flagged it. They (Oran and Shiran) said, 'Our numbers are great.' When numbers started dropping, that's when they started taking it seriously."

66. FE-1 repeated: "The first 'Fire Drill' that had to do with numbers dropping, something not being right, was in October last year." It was at that time in October 2025 that "[t]wenty-five of us pulled off what we were doing and working (on it). It was definitely a fire drill." FE-1 stated that it was at that time "I learned from someone who was on the digital team at Il Makiage, that this was something that had been flagged before, this issue, and they didn't address it until later."

67. In addition to the Brand 4 team, FE-1 said Oddity also pulled additional workers from SpoiledChild and Methodic brands to assist with trying to diagnose the issues associated with the algorithm change. While some employees returned back to their original product assignments, "[r]oughly half the team stayed on (Il Makiage) until I left [the Company]," FE-1 said.

68. FE-1 said at the same time he and his team were pulled off Brand 4 to problem-solve the plummeting numbers associated with Il Makiage, they were also asked to try and fix a host of issues surrounding the Il Makiage website and consumer interface. "A lot of what we were doing when we got called in, super high priority, directly from Shiran (Holtzman), was looking at recordings on the website," he said. FE-1 stated that the marching orders given to the Brand 4 workers were to problem-solve the algorithm/revenue issues as well as to fix the Il Makiage website to address certain complaints. "Yes, but they were in a sense trying to streamline customer service and make the landing page for cancellation seamless. I don't think they wanted to fix people getting into subscriptions they weren't aware of. That was kind of the point."

69. When asked whether FE-1 interacted with CEO Oran Holtzman or CFO Lindsay Drucker Mann, FE-1 said yes. "I was on product development for Brand 4," FE-1 explained. "Most of my interactions with them were about product. When this issue first arose, they basically pulled all of us off product for a couple of months and had us working with the Il Makiage team to try and figure out what the issue was."

70. FE-1 stated that co-founder and Chief Product Officer, Shiran Holtzman-Erel, (Oran Holtzman's sister), "was our main line of communication" for the fire drill. "She reached out to the CEO of Brand 4, Ken Russo. All our communication came through Shiran Holtzman," FE-1 said. "Shiran and Oran, everything was from both of them. If something came from Shiran, we all knew it was basically coming from Oran" FE-1 said.

71. FE-1 also confirmed that in October 2025, he and other workers were explicitly told not to speak about the issue to anyone.

72. When asked why FE-1 chose to leave the Company voluntarily, he stated "I felt like there was something they weren't telling us" and "We've been told explicitly: Everyone is replaceable, you need to be loyal."

73. FE-1 was read a direct quote of Holtzman from the February 25, 2026 press release that Oddity issued, which included statements from Holtzman to investors that the company had "experienced a dislocation in our account with our largest advertising partner that we believe was driven by algorithm changes which diverted us to lower quality auctions at abnormally high costs," which also "resulted in significant increases in new user acquisition costs that are not correlated with the market or our historical experience." When asked if Holtzman's explanation sounded truthful and accurate, FE-1 stated, "No." "The biggest thing with that statement, I was there when that came out, a lot of beauty brands have an advertising partner. We did not have that at Oddity," FE-1 continued. "All of our ads were paid on Instagram and Facebook," FE-1 stated. "I was not aware of any other advertising partner we worked with."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### VI. DEFENDANTS' OMISSIONS OF MATERIAL FACTS

74. The Class Period begins on February 26, 2025. On February 25, 2025, during post-market hours, Oddity issued a press release reporting its financial results for the fourth quarter and full year of 2024.

75. The same day, also during post-market hours, Oddity filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for its fourth quarter and year ended December 31, 2024 (the "Annual Report").

76. Appended to the 2024 Annual Report were signed certifications, pursuant to the Sarbanes-Oxley Act of 2002, by Holtzman and Mann, in which each attested that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

**A. Defendants Violated Their Affirmative Disclosure Duties Under Item 105/Form 20-F Item 3(D) and Item 303/Form 20-F Item 5**

77. Defendants had affirmative disclosure duties under SEC disclosure rules.

78. Item 3(D) of Form 20-F requires a company to disclose, under the heading "Risk Factors," the risk factors that are specific to the company or its industry and that make an investment speculative or high risk. The instructions require the issuer to explain clearly how each risk affects the company or the securities. One of several non-exhaustive examples provided under Item 3(D) is "dependence on a limited number of customers or suppliers." These requirements are materially similar to Item 105 of Regulation S-K, which requires disclosure of the material factors that make an investment in the registrant or offering speculative or risky and discourages generic risk-factor disclosure that could apply to any issuer or any offering.

79. Defendants violated Item 3(D) of Form 20-F and Item 105 because the Annual Report failed to disclose the specific and heightened risk from Oddity's reliance on a single social media company – Meta – for its advertising. Given that Oddity sold its products exclusively online – having no physical stores and no other channels of distribution – the Company's sole reliance on Meta for advertising made the Company vulnerable to any change in Meta's algorithm, which could suddenly demote Oddity's advertisements to less desirable locations and demographics outside of the Company's control. Defendants never disclosed the Company's reliance on a single advertiser, which made an investment in Oddity speculative and high risk.

80. Defendants also violated Item 5 of Form 20-F, which imposes disclosure obligations materially similar to Item 303 of Regulation S-K. Item 5 requires foreign private issuers to discuss known trends, uncertainties, demands, commitments, or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition. Item 5 also requires disclosure of other information necessary for investors to understand the company's financial condition, changes in financial condition, and results of operations.

81. Specifically, Part I, Item 5(d) of Form 20-F requires registrants to:

> [I]dentify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

82. "The disclosure requirements for Item 5 of Form 20-F (Operating and Financial Review and Prospects) are substantively comparable to the MD&A requirements under Item 303 of Regulation S-K."[3]

83. In a 1989 Interpretive Release,[4] the SEC describes the purposes of the MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.

---

[3] SEC Final Rule Release No. 33-10890, Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information, Nov. 19, 2020, at 91; see also Willard v. UP Fintech Holding Ltd., 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021).

[4] Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures, Release No. 6835 (May 18, 1989).

> MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

84. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

85. Accordingly, Oddity had an affirmative obligation to disclose facts in the 2024 Annual Report filed on Forms 20-F required by Item 5 of Form 20-F and Item 303 of Regulation S-K, including information regarding known trends, uncertainties, or events, including, but not limited to, the fact that the Company was experiencing significant and unusual customer and/or asset outflows throughout the Class Period.

86. The SEC has long recognized that MD&A disclosure is intended to allow investors to view the registrant through management's eyes by providing both historical and prospective analysis of the registrant's financial condition and results of operations. Item 303 and Item 5 require disclosure of known trends and uncertainties unless management determines that a material effect on financial condition or results of operations is not reasonably likely to occur.

87. Defendants violated Item 5 of Form 20-F and Item 303 because the undisclosed risks alleged above were known or reasonably knowable and were reasonably likely to have a material effect on Oddity's customer acquisition costs, new customer purchases and revenue.

88. Defendants therefore failed to disclose material risks and uncertainties required to be stated in the Annual Report. the Annual Report failed to disclose the specific and heightened risk from Oddity's reliance on a single social media company – Meta – for its advertising. Given that Oddity sold its products exclusively online – having no physical stores and no other channels of distribution – the Company's sole reliance on Meta for advertising made the Company vulnerable to any change in Meta's algorithm, which could suddenly demote Oddity's advertisements to less desirable locations and demographics outside of the Company's control. These omissions violated under Item 105/Form 20-F Item 3(D) and Item 303/Form 20-F Item 5, and separately rendered the Annual Report's generic risk warnings materially misleading.

**B. The Annual Report's Generic Risk Warnings Were Materially Incomplete Half-Truths**

89. The Annual Report included generic warnings concerning the importance of social media to the Company. Specifically, the Annual Report stated:

> We and our content creators use third-party social media platforms to raise awareness of our brands and engage with our customers. As existing social media platforms evolve and new platforms develop, we and our content creators must continue to maintain a presence on these platforms and establish a presence on emerging popular social media platforms. If we are unable to cost-effectively use social media platforms as marketing tools, our ability to acquire new customers and our financial condition may suffer.

90. These warnings were materially incomplete and misleading. ***First***, the disclosure refers to Oddity's advertising on social media platforms, ***plural***. This disclosure did not warn investors of Oddity's exclusive reliance on Meta for its social media advertising. ***Second***, the disclosure did not warn investors of the specific risk related to an algorithm change, which would be compounded by the Company's reliance on a single social media company (Meta) for its advertising as well as Oddity's high customer dissatisfaction and product returns from it "buy before you try" program.

91. Accordingly, the Annual Report omitted material facts necessary to make its risk disclosures not misleading.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

92. On August 4, 2025, Oddity issued a press release reporting its financial results for the second quarter of 2025. The press release quoted Defendant Holtzman as touting the Company's financial and operating results, stating that "***momentum continued into the second quarter with yet another beat and raise across revenue, profit, and earnings per share***" and that ***"[o]ur business is growing with high profitability, multiple engines, and long runways[.]***" Holtzman said that "[t]hese strong financials allow us to continue reinvesting in our future, including technology, ODDITY Labs, and building new brands".

93. For the quarter, Oddity reported approximately $117.258 million in selling, general and administrative costs, compared to $86.055 million for the same period in the prior year.

94. In the same vein, the press release quoted Defendant Mann as stating:

> ***We are pleased with our financial results for the second quarter, which beat our guidance on revenue, gross margin, adjusted EBITDA, and adjusted EPS. The third quarter is also off to a strong start[.] . . . The remainder of our year is driven mostly by a high visibility backlog of repeat orders. These factors altogether give us confidence to once again raise our full year outlook***.

95. Accordingly, the press release stated:

> ODDITY is raising its financial outlook for the full year ending December 31, 2025:
>
> - Net revenue between $799 million and $804 million, representing year-over-year growth between 23% and 24%.
> - Gross margin of approximately 71%.
> - Adjusted EBITDA between $160 million and $162 million.
> - Adjusted diluted EPS between $2.06 and $2.09. This assumes an effective tax rate of approximately 19%.

96. The statements referenced in ¶¶92-95 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) due to an algorithm change by Oddity's largest/exclusive advertising partner Meta, which Oddity discovered in June 2025, Oddity's advertisements were being diverted to lower quality auctions at abnormally high costs; (ii) the foregoing significantly increased Oddity's customer acquisition costs, thereby negatively impacting Oddity's business and financial prospects including its customer purchases (especially new customer purchases); (iii) accordingly, Defendants overstated the overall strength, stability, and sustainability of Oddity's digital operating model and/or market position; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times. In touting that the "business is growing" with "long runways" and "high visibility backlog of repeat orders," Defendants misled investors by failing to disclose that they knew that new customer acquisition costs and purchases indicated that any growth or "runway" would be extremely short before it dropped precipitously.

97. On November 19, 2025, Oddity issued a press release reporting its financial results for the third quarter of 2025. As in the previous two quarters, the press release trumpeted the Company's purportedly strong quarterly performance and near-term prospects, quoting Defendants Holtzman as stating that "ODDITY delivered strong third quarter results, including financial performance that once again exceeded our guidance across revenue, profit, and earnings per share" and describing the Company as "***well positioned for a strong finish in 2025 with multiple engines to drive future growth***, and we continue to invest in new brands, ODDITY Labs, and tech innovation."

98. For the quarter, Oddity reported approximately $88.526 million in selling, general, and administrative costs, compared to $63.698 million for the same period in 2024.

99. Similarly, the press release quoted Defendant Mann as stating:

> We are pleased with our financial results for the third quarter, which beat our guidance on revenue, gross margin, adjusted EBITDA, and adjusted EPS[.] . . . Our solid start to the fourth quarter gives us confidence to once again raise our full year outlook.

100. Once again, Oddity raised its financial outlook for the year accordingly:

- Net revenue between $806 million and $809 million, representing year-over-year growth between 24% and 25%.
- Gross margin of approximately 72.5%.
- Adjusted EBITDA between $161 million and $163 million.
- Adjusted diluted EPS between $2.10 and $2.12. This assumes an effective tax rate of approximately 20%.

101. The statements referenced in ¶¶97-100 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) in June 2025, Oddity discovered an algorithm change by the Company's largest/exclusive advertising partner Meta which caused Oddity's advertisements to be diverted to lower quality auctions at abnormally high costs; (ii) Oddity's costs and purchases were so significantly impacted that the Company had instigated a "fire drill" – reassigning dozens of employees from other positions to diagnose the cause of the downgrade; (iii) the cause of the demotion was the high number of customer complaints concerning Oddity's products, service, customer interface and billing; (iv) the foregoing significantly increased Oddity's customer acquisition costs, thereby negatively impacting Oddity's business and financial prospects including its customer purchases (especially new customer purchases); (v) accordingly, Defendants overstated the overall strength, stability,

and sustainability of Oddity's digital operating model and/or market position; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

102. During the prepared remarks of the earnings call on November 20, 2025, Mann stated, "***We had higher-than-planned media costs in the quarter and have seen the media backdrop improve as we progressed into the fourth quarter***."

103. An analyst asked, "is the growth algo for 2026 any different from what we've expected or what we've heard from you guys up until this point, which is committing to basically 20% top line, about 20% adjusted EBITDA margins. And maybe within that, maybe just talk about the marketing efficiency in the business that you're seeing." Mann responded:

> [***T]here's no change to our algorithm of 20% revenue growth and 20% adjusted EBITDA margin***. And you heard Oran reiterate in his remarks earlier that the other sort of medium-term guidance that we've given for IL MAKIAGE to deliver $1 billion by 2028, there's no change to that either***. So business continues to be on a very healthy footing.***
>
> As far as media efficiency goes, ***you heard Oran comment, we did have some higher acquisition costs. In my remarks, I mentioned the environment has actually improved for us as we've gotten into the fourth quarter. Overall, SG&A in the third quarter was up around 30%, and that's including some of the increased spending initiatives that we have, for example, for METHODIQ, ODDITY LABS, et cetera. So it's been very manageable for us, and we're feeling really good as we head into Q4.***

104. Another analyst followed up on the issue of media expenses, asking, "Just hoping you could expand on the comments around the media environment and higher acquisition costs now going a little lower. And anything in particular to call out on the search channel?" Mann responded, "Sure. On the media side, media costs, as we've said before, ***they tend to get more expensive every year, but we are able to offset them really effectively with higher repeat and also other unlocks across our KPIs, including conversion and other things that we focus on. So this has allowed us to deliver a very healthy, sustained profitable business and repeat is running at around, call it, two-third of our overall business***."

105. The statements referenced in ¶¶102-104 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) in June 2025, Oddity discovered an algorithm change by the Company's largest/exclusive advertising partner Meta which caused Oddity's advertisements to be diverted to lower quality auctions at abnormally high costs; (ii) Oddity's costs and purchases were so significantly impacted that the Company had instigated a "fire drill" – reassigning dozens of employees from other positions to diagnose the cause of the downgrade; (iii) the cause of the demotion was the high number of customer complaints concerning Oddity's products, service, customer interface and billing; (iv) the foregoing significantly increased Oddity's customer acquisition costs, thereby negatively impacting Oddity's business and financial prospects including its customer purchases (especially new customer purchases); (v) accordingly, Defendants overstated the overall strength, stability, and sustainability of Oddity's digital operating model and/or market position; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times. Specifically, although Defendants identified higher "media costs" in Q3 2025, they misleadingly suggested that the increase was normal ("they tend to get more expensive every year"), and falsely stated that the increase was from "the increased spending initiatives that we have, for example, for METHODIQ, ODDITY LABS," omitting the significant increased costs from the unexpected and unusual algorithm change. They also falsely asserted that "the environment has actually improved for us as we've gotten into the fourth quarter" when it was actually getting worse, would continue to get worse because the algorithm change implicated the Company's important TBYB program and the Company had not yet implemented a solution for the algorithm demotion. Defendants also

misled investors as to the current and future prospects of the Company, stating that "there's no change to our algorithm of 20% revenue growth and 20% adjusted EBITDA margin" and "business continues to be on a very healthy footing" when the algorithm change had been impacting customer acquisition costs and purchases since at least June 2025 and was getting worse.

106. Analysts responded favorably to Defendants' statements. A November 20, 2025, Barclays analyst report noted that there was "nothing incrementally negative to point out or to fuel the bear case."

107. A November 20, 2025, Bank of America Securities report reiterated its Buy rating, noting that Oddity "still expects to achieve 20% EBITDA margins due to leverage in 2H26, in line with its long-term growth algorithm."

108. A November 20, 2025 J.P. Morgan report noted that "higher-than-planned media costs…have cooled in 4Q[to date]."

## THE TRUTH BEGINS TO EMERGE

109. The truth began to emerge on February 25, 2026, when Oddity issued a press release "announc[ing] its financial results for the fourth quarter and full year ended December 31, 2025." In the press release, Defendant Holtzman stated that "we experienced a dislocation in our account with our largest advertising partner that we believe was driven by algorithm changes which diverted us to lower quality auctions at abnormally high costs", which "result[ed] in significant increases in new user acquisition costs that are not correlated with the market or our historical experience."

110. In the same press release, Defendant Mann said, "Given the dislocation we are experiencing in acquisition costs, ***we expect first quarter 2026 revenue to decline approximately 30% year-over-year***" and "We plan to issue our financial outlook for FY 2026 in the next few months when we have more visibility."

111. During a subsequent earnings call held the same day, Defendants expanded on the issue. Mann acknowledged that "CPA is significantly higher than last year, in some cases 2x higher," and Holtzman stated "even more than 2x."

112. During prepared remarks, Holtzman misleadingly suggested that Defendants only became aware of the algorithm change and its impact on the Company in 2026, stating:

> Turning to our acquisition costs. We experienced an unprecedented dislocation in our account with our largest advertising partner, which we believe is due ***to recent changes in their algorithms*** that likely diverted us to less desirable auctions and traffic at abnormally high costs. These changes resulted in significant abnormal increases in our ***New Year's acquisition costs for auditing*** that are not correlated with the market or our historical experience.
>
> We've never seen anything close to those acquisition costs, not in auditing, and also not in other beauty advertisers. This elevated acquisition cost is severely hurting our ability to acquire new users efficiently at a high scale as we normally do in the first half of each year and have done consistently for the past eight years very successfully.
>
> Both IL MAKIAGE and the SpoiledChild appear to be impacted by these algorithm changes, although the impact on IL MAKIAGE was more severe, probably due to its higher scale. After identifying the root cause in ***late January, we quickly moved*** to implement stronger remediation actions, primarily around the modern infrastructure that we hope will get us back to the right auctions and ultimately drive improvement in our new user acquisition with significant progress in Q2 and normalization in Q3 or Q4.

113. Holtzman acknowledged that "[t]hese types of algorithm updates are not new and have been ongoing through the years" and the Company had been aware "algorithm adjustments by our ad partners in the past" that could significantly impact the Company, providing as an example "A prominent one was iOS 14" from before Oddity went public in 2023.

114. Holtzman omitted any mention of the Company's high customer dissatisfaction rate concerning improper billing and difficult subscription cancelation, misleadingly suggesting that Oddity was unfairly "hit by the algorithm change" only because of "pro-consumer model" of "try-before-you-buy" and describing it as a "technical issue" that the Company was addressing and

therefore "we hope will get us back to the right auctions and ultimately drive improvement in our new user acquisition with significant progress in Q2 and normalization in Q3 or Q4":

> We believe we got hit by the algorithm change due to our user acquisition strategy that includes a try-before-you-buy offering, which is a wearing beauty and therefore may be an edge case within the new algorithm changes. We believe the algorithm updates impacts on how this platform interprets and weighs the signals associated with drivers by model primarily due to its inherent higher return rates and diverted us to lower quality auctions at abnormally high costs disconnected from the market.
>
> For more context about the model, try-before-you-buy is designed for the benefit of the consumer by reducing the risk of trying our products online. It is a pro-consumer model that allows us to replicate online the experience of physical stores like Sephora, where consumers can try products in real life and materially reduce the risk of purchase.
>
> This model is growing in beauty due to its complex execution. We believe it's an edge case and a non-obvious interaction within the platform's new auction dynamics. After assessing the driver of what we believe is hitting us, we quickly move to fix it. Our remediation actions are designed to reduce the price before you buy down-weighting while preserving the ability for new customers to purchase products on a trial basis with minimal risk.

115. During the question-and-answer portion of the call that followed, an analyst asked Oddity's officers: "When did the issue actually start? When did you start seeing it?" In response, Mann represented that the Company had purportedly only first "***observed*** that something was different in the second half of 2025" – that is, without acknowledging when the issue had actually started or the alarm raised within the Company by October 2025.

116. On this news, Oddity's Class A ordinary share price fell $14.28 per share, or 49.21%, to close at $14.74 per share on February 25, 2026, and continued to decline, closing at $13.77 on February 26, 2026.

117. Market analysts were quick to react to Oddity's disclosures. Following the Company's earnings announcement, Bank of America, JPMorgan Chase, Barclays, Evercore ISI, Needham, Truist, Jefferies, and Citizens all downgraded Oddity, citing concerns about Oddity's

dependence on advertising partners, visibility on the Company's growth, and the potential duration of higher customer acquisition costs.

118. As a February 25, 2026, report by J.P. Morgan explained, "The 1Q guide came as nothing short of a shock to us given how consistently ODD has delivered 20%+ growth since its IPO."

119. Analysts were skeptical of Defendants' benign explanation for why Oddity was "hit by the algorithm." A February 2026 report by Barclays stated:

> While we are certainly not experts in the Internet/DTC/direct marketing space and as such are not as familiar with how changes to advertising platform algorithms impact DTC companies P&Ls, we have leveraged the knowledge of our US Internet colleague, Ross Sandler, who covers many companies that either have a high dependency on SEO (e.g., TRIP, IAC, ZD) or paid acquisition (NRDS, LIFE). In our discussions, ***Ross suggested that there are several companies in the space that historically feature either Try Before You Buy models (Zenni, Hello Fresh, etc) or that have naturally high return rates because of the nature of the service (e.g., multiple items in a box, return those not being purchased – for Stich Fix, Revolve, Warby Parker.com, etc) and he has not heard of an advertising partner, like Meta, penalizing an entire category in 1Q26 to the extent that Oddity's financials would imply in 1Q.*** It is not completely out of the ordinary for platform policy changes like last year's removal of demo targeting in financial services at META to impact an entire category. ***That is to say, he has not seen any company within his coverage running a similar business model experience such a sudden drop in revenue due to an algorithm change in 1Q26. In contrast, Revolve (RVLV) which is an apparel e-commerce company that has naturally high return rates online reported a solid quarter just yesterday (see: Growth Re-accelerating as Beauty Picks up Feb 25, 2026). As such, with Oddity seemingly potentially isolated in its challenge to overcome an algorithm change at its largest advertising partner, we can't help but wonder if there are deeper challenges that ultimately emerge over time.*** Specifically, we worry that adjusting the "signals" may prove to just be part of the fix, but the underlying issue may also center with the nature of Oddity's Try Before You Buy approach.

120. On June 2, 2026, Oddity issued a press release "announc[ing] its financial results for the first quarter ended March 31, 2026" in which the Company stated: "For the second quarter of 2026, ODDITY expects net revenue to decline between 25 and 30% year-over-year."

121. During the earnings call that followed, in response to an analyst's question, Mann disclosed not only that the customer acquisition costs continued to increase in Q2 2026 but that the "rate of increase did get worse" as well":

> Yeah. So we are still spending. And so media spend for the quarter was down a little bit relative to the prior year. It's just that our efficiency on that media is a lot worse. So we talked about you can see in the table that we provided the 80-plus percent increase year-over-year in the first half.
>
> And ***that rate of increase did get worse Jan, Feb, March to April, and May was our first month of sequential improvement.*** So we are still spending.

122. In response to another analyst's question, Mann clarified that that the improvement in May over April was not an improvement over Q1 2026:

> [S]o our guidance for the second quarter is for revenue to be down between 25% and 30%. The challenge for us in part is that acquisition is still very difficult. ***We talked about the sequential improvement in May versus April, but remember that Feb was worse than Jan, March was worse than Feb and April was worse than March. So on balance, the overall CPA in May versus Q1 is not materially different yet***, but we noted the encouraging thing for us is the positive inflection that we saw in May overall.

123. On this news, Oddity's Class A ordinary share price fell $4.14 per share, or 29.61%, to close at $9.84 per share on June 2, 2026.

124. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## ADDITIIONAL SCIENTER ALLEGATIONS

125. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in

a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

126. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Indeed, as Defendants Holtzman acknowledged on Oddity's February 25, 2026 earnings call, Oddity "observed" the algorithm changes and/or the consequences for the quality of the Company's ad auctions and customer acquisition costs at some point in the second half of 2025. Moreover, considering the extent of Oddity's reliance on advertising partners to support its sales growth, the Company's leadership plainly would have been highly attentive to any and all issues impacting the quality of its ad auctions, and thus its customer acquisition costs, including any dislocations or algorithm changes involving its single largest advertising partner.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

127. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Oddity securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

128. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Oddity securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class

may be identified from records maintained by Oddity or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

129. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

130. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

131. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Oddity;
- whether the Individual Defendants caused Oddity to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Oddity securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

132. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

133. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Oddity securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Oddity securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

134. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

135. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

136. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

137. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

138. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Oddity securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Oddity securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

139. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Oddity securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Oddity's finances and business prospects.

140. By virtue of their positions at Oddity, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

141. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Oddity, the Individual Defendants had knowledge of the details of Oddity's internal affairs.

142. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Oddity. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Oddity's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

Oddity securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Oddity's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Oddity securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

143. During the Class Period, Oddity securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Oddity securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Oddity securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Oddity securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

144. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

145. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

146. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

147. During the Class Period, the Individual Defendants participated in the operation and management of Oddity, and conducted and participated, directly and indirectly, in the conduct of Oddity's business affairs. Because of their senior positions, they knew the adverse non-public information about Oddity's finances and operations.

148. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Oddity's financial condition and results of operations, and to correct promptly any public statements issued by Oddity which had become materially false or misleading.

149. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Oddity disseminated in the marketplace during the Class Period concerning Oddity's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Oddity to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Oddity within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Oddity securities.

150. Each of the Individual Defendants, therefore, acted as a controlling person of Oddity. By reason of their senior management positions and/or being directors of Oddity, each of

the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Oddity to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Oddity and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

151. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Oddity.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 13, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044

jalieberman@pomlaw.com
mjwernke@pomlaw.com

*Attorneys for Plaintiffs*